UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

CASE NO. _____

UNITED STATES,                                    **FILED UNDER SEAL**

    ex rel.

MATTHEW MOORE,                     2:16-CV-99-FtM-29 MRM

    Plaintiff,

v.

21ST CENTURY ONCOLOGY, LLC,

    Defendant.

_____/

## QUI TAM COMPLAINT

The Relator, Matthew Moore, brings this qui tam action in the name of the United States against 21st Century Oncology, LLC ("21st Century") and states as follows:

## OVERVIEW

1.    This is a False Claims Act ("FCA") case arising from the illegal compensation of physicians in violation of 42 U.S.C. § 1395nn, commonly known as the "Stark Law." From at least January 2010 and continuing to the present, 21st Century entered into various compensation agreements with employed physicians that included compensation based on the volume or value of physician referrals in violation of the Stark Law. By knowingly submitting claims for reimbursement based on referrals generated by physicians who received compensation based on these terms, 21st Century violated the FCA. This conduct resulted in millions of dollars of damages to the taxpayers.

S-2

## JURISDICTION AND VENUE

2.      The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732.

3.      The Court has personal jurisdiction over 21st Century pursuant to 31 U.S.C. § 3732(a) because 21st Century can be found in and transacts the business that is the subject matter of this lawsuit in the Middle District of Florida.

4.      Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because the acts complained of herein occurred within the Middle District of Florida.

5.      Pursuant to 31 U.S.C. § 3730, this Complaint is to be filed *in camera* and remain under seal for a period of at least sixty (60) days, unless the Government requests an extension.

## THE PARTIES

6.      The Relator, Matthew Moore, resides in the State of Alabama.  He is a Certified Public Accountant and has worked in the area of healthcare accounting for most of his professional career.  A former auditor with the firm of Ernst & Young, Relator also previously served as the Chief Financial Officer for several hospitals and has extensive training and experience with regard to permissible forms of physician compensation.  In November 2015, Relator served briefly as the Interim Vice President of Financial Planning for 21st Century.  He quickly discovered the illegal compensation practices described in this Complaint and was fired when he questioned these  practices.

7.      Defendant 21st Century, LLC ("21st Century") is a limited liability company with its headquarters in Fort Myers, Florida.  21st Century operates a nationwide physician practice with approximately 100 centers clustered into regional networks across the United States.

2

8.   21st Century also employs physicians through a variety of subsidiary entities, the exact legal names for which have not yet been fully identified.   Discovery will reveal the names of these entities.

## THE FALSE CLAIMS ACT

9.   The FCA provides for the award of treble damages and civil penalties for, *inter alia*, knowingly causing the submission of false or fraudulent claims for payment to the United States Government.   *See* 31 U.S.C. § 3729(a)(1).

10.   The FCA provides, in pertinent part, that a person who:

(a)(1)(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment of approval;

(a)(1)(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

. . .

(a)(1)(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay retransmit money to the government,

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 . . . plus three times the amount of damages which the Government sustains . . . .

*See* 31 U.S.C. § 3729.

11.   For purposes of the FCA,

the terms "knowing" and "knowingly" mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity the information; or (3) acts in reckless disregard of the truth or falsity the information; and

requires no proof of specific intent to defraud.

*See* 31 U.S.C. § 3729(b).

## THE MEDICARE PROGRAM

12.     Congress enacted the Medicare program in 1965 as Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.*  The program provides medical insurance for persons age 65 and older or for persons under age 65 who are disabled.  The United States Department of Health and Human Services ("HHS") supervises the Medicare program through the Centers for Medicare and Medicaid Services ("CMS").

13.     The Medicare program consists of several parts, including Parts A and B.  Part A, funded by Social Security taxes, provides major medical insurance coverage for the cost of hospital care, related post-hospital services, home health services and hospice care.  *See* 42 U.S.C. §§ 1395c – 1395i.  Medicare Part A provides benefits for drugs administered in inpatient settings, such as hospitals.

14.     Part B is a federally subsidized, voluntary health insurance program that provides benefits for outpatient settings.  Medicare Part B provides limited benefits for drugs administered to patients in certain outpatient settings, such as physician offices.

## THE MEDICAID PROGRAM

15.     Medicaid is a public assistance program that provides for payment of medical expenses for low-income patients, with funding shared between the federal government and state governments.  *See* 42 U.S.C. § 1396a(a)–(b).   States pay healthcare providers, including pharmacies, according to established rates, and the federal government then pays a statutorily established share of the "total amount expended . . . as medical assistance under the State plan." *See* 42 U.S.C. § 1396b(a)(1).  Although Medicaid is administered on a state-by-state basis, the state programs are required to adhere to federal guidelines.

## THE STARK LAW

16.     Enacted as amendments to the Social Security Act, 42 U.S.C. § 1395nn (commonly known as the "Stark Law") prohibits any entity from submitting Medicare claims for "designated health services," as defined in 42 U.S.C. § 1395nn(h)(6), that arise from referrals from physicians having a "financial relationship" (as defined in the statute) with that entity.

17.     The Stark Law establishes the clear rule that the United States will not pay for designated health services prescribed by physicians who have improper financial relationships. The statute was designed specifically to prevent losses that might be suffered by the Medicare program due to questionable utilization of designated health services.

18.     Stark Law explicitly states that Medicare cannot pay for any designated health service provided in violation of the Stark Law. *See* 42 U.S.C. § USC 1395nn(g)(1).  In addition, the regulations implementing the Stark Law expressly require that any entity collecting payment for a healthcare service "performed under a prohibited referral must refund all collected amounts on a timely basis." *See* 42 C.F.R. § 411.353.

19.     Congress enacted the Stark Law in two parts, commonly known as Stark I and Stark II.  Enacted in 1989, Stark I applied to referrals of Medicare patients for clinical laboratory services made on or after January 1, 1992, by physicians with a prohibited financial relationship with the clinical lab provider, unless a statutory or regulatory exception applied. *See* Omnibus Budget Reconciliation Act of 1989, P.L. 101–239, § 6204.

20.     In 1993, Congress passed Stark II, which extended the Stark Law to referrals for ten additional designated health services. *See* Omnibus Reconciliation Act of 1993, P.L. 103-66, § 13562, Social Security Amendments of 1994, P.L. 103–432, § 152.

21.     The Stark Law prohibits entities from submitting a claim to Medicare for designated health services that were referred to the entity by a physician with whom the entity has a "financial relationship," unless a statutory exception applies.   Designated health services includes radiology imaging services and radiation therapy services.   *See* 42 U.S.C. § 1395nn(h)(6).

22.     In pertinent part, the Stark Law provides

(a)     Prohibition of certain referrals

(1) In general

Except as provided in subsection (d) of this section if a physician... has a financial relationship with an entity specified in paragraph (2), then –

(A)     the physician may not make a referral to the entity for the furnishing of designated health services for which payment otherwise may be made under this subchapter, and

(B)     the entity may not present or caused to be presented a claim under this subchapter or bill to any individual, third party payer, or other entity for designated health services furnished pursuant to a referral prohibited under subparagraph (a).

*See* 42 U.S.C. § 1395nn(a)(1).

23.     Moreover, the Stark Law provides that Medicare will not pay for designated health services billed by an entity when the designated health services resulted from a prohibited referral under subsection (a). *See* 42 U.S.C. § USC 1395nn(g)(1).

24.     "Financial relationship" includes a "compensation arrangement" which means any arrangement involving any remuneration paid directly or indirectly to a referring physician. *See* 42 U.S.C. § USC 1395nn(h)(1)(a) & (h)(1)(b).

25.     The Stark Law and companion regulations contain exceptions for certain compensation arrangements.   These include, among others, bona fide employment relationships

and personal service arrangements.

26.    In order to qualify for the Stark Law exceptions for bona fide employment relationships, compensation arrangements must meet, *inter alia*, the following statutory requirements: (A) the amount of remuneration is fair market value and not based on the value or volume of referrals, and (B) the remuneration would be commercially reasonable even in the absence of referrals from the physician to the entity. *See* 42 U.S.C. § USC 1395nn(e)(2)(B) & (e)(2)(C).

27.    In order to qualify for the Stark Law exception for personal service arrangements, a compensation arrangement must meet, *inter alia,* the following statutory requirements: (A) the compensation does not exceed fair market value, and (B) it is not determined in a manner that takes into account the volume or value of any referrals of other business generated between the parties (unless it falls within a further "physician incentive plan" exception is described in statute). *See* 42 U.S.C. § 1395nn(e)(3)(A)(v).

28.    In order to qualify for the Stark Law exception for fair market value compensation, there must be an agreement in writing, the agreement must set forth all services to be furnished, all compensation must be set in advance and consistent with fair market value, the agreement must not take into consideration the volume or value of referrals or other business generated by the referring physician, and the agreement must not violate federal or state law. *See* 42 C.F.R. § 411.357(*l*).

29.    The Stark Law also applies to claims for payment under Medicaid, and federal funds may not be used to pay for designated health services through a state Medicaid program. *See* 42 U.S.C. § 1396(b)(s).

7

## THE FRAUD SCHEME

30.     Beginning at least in January 2010 and continuing to the present, 21st Century devised a scheme by which it:

A.      Entered into compensation arrangements with physicians in violation of the Stark Law, specifically by paying the physicians (who referred designated health services) under contracts that exceeded fair market value, were not commercially reasonable, and/or took into account the volume or value of the referrals of other business generated between the physician and 21st Century.

B.      Submitted and/or caused others to submit false and fraudulent claims for payment to Medicare and Medicaid, which included claims related to designated health services rendered to patients who were referred to the entity by the physicians who had improper contracts which violated the Stark Law.

## RELATOR JOINS 21ST CENTURY

31.     In November 2015, 21st Century hired Relator to work as the Interim Vice President of Financial Planning. 21st Century obtained Relator's services through a third party agency, Tatum, a Randstad Company. The engagement was supposed to last three to six months.

32.     Prior to undertaking the assignment, Relator had a great deal of experience with physician compensation issues. He had previously served as the Chief Financial Officer of a hospital and in several other financial positions in the healthcare industry.

33.     As the Interim Vice President of Financial Planning, Relator's duties included oversight for physician compensation and financial planning functions. He worked at 21st Century's corporate headquarters in Fort Myers, Florida, and he reported to the company's Chief Financial Officer ("CFO"), LeAnne Stewart.

8

34.     Part of Relator's job duties involved approval of monthly bonus checks paid to physicians employed by the company.  In order to approve bonus checks, Relator had to familiarize himself with the contract terms between 21st Century and its numerous physicians. To this end, Relator's direct report, Amy Lyons, the Director of Physician Compensation, provided Relator with a lengthy excel spreadsheet, which she prepared and maintained on an ongoing basis.  The spreadsheet listed all of 21st Century's employed physicians with summary columns for each physician's contract initiation date, term, renewal date, base salary, production bonus and other information relevant to the physician.

35.     Based on this spreadsheet and conversations with the Director of Physician Compensation, Relator discovered that 21st Century divides its employee physicians into three (3) categories for compensation purposes.  First, 21st Century employs Radiation Oncologists, who work in the company's various radiation therapy centers.  The company compensates Radiation Oncologists based largely on their personally performed services.

36.     Next, 21st Century employees "eat what you kill" or "EWYK Physicians."  These are not radiation oncologists, but other specialists such as medical oncologists, breast surgeons, urologists and others.   21st Century compensates EWYK Physicians based on formulas that allow the physicians to share in the profits (or losses) of their personally performed services. These physicians also participate in ancillary bonus pools.  EWYK Physicians have a higher compensation upside, but also bear the risk of losses if they are not profitable.

37.     Third and finally, 21st Century employs "ICC Staff Physicians."  These are not Radiation Oncologists, but other specialists in areas similar to the EWYK Physicians.  Unlike EWYK Physicians, however, ICC Staff Physicians do not bear any risk of financial loss from their practices.  Instead, 21st Century compensates ICC Staff Physicians based upon employment

9

contracts that set forth guaranteed salaries, with no pooled compensation. In the ICC Staff Physician practices, 21st Century bears the risk of any losses generated by the physicians' practice.

38.    Relator also discovered that 21st Century collects revenues from multiple physician- related sources. As an example, 21st Century collects revenue from work personally performed by employee physicians, such as office visits performed by a medical oncologist. 21st Century also collects revenue from Designated Health Services that are not personally performed by a given employee physician, but nonetheless referred by that physician. As an example, a 21st Century employee physician might refer a patient to a 21st Century radiation therapy center for radiation oncology therapy or radiology diagnostic testing services.

## THE PROPOSED NEW HIRE

39.    In November 2015, 21st Century's CFO asked Relator to meet with an individual from the company's business development department, who was responsible for assisting with locating and recruiting potential new physician hires. The business development person proposed to hire a breast surgeon located in Redding, California. As part of his review, Relator examined a spreadsheet that projected the new physician would generate $175,000 per year in collections. The business development person proposed to hire this surgeon as an ICC Staff Physician with a guaranteed salary of $250,000 per year.

40.    In a meeting with the CFO and the business development person, Relator questioned why the company would pay this physician more than she actually collected in annual billings, as this would be equivalent to "losing money" on that physician. The business development person replied that, "She [the new physician] generates over 100 referrals a year that would come to us." Relator understood this to mean the new doctor would make referrals of

Designated Health Services to 21ˢᵗ Century, which referrals would more than make up for the losses from her guaranteed salary.

41.     This comment alarmed Relator, as he was well aware of the Stark Law and other prohibitions against paying physicians in exchange for referrals. Relator advised the CFO and the business development person that they could not make compensation decisions based on referrals a physician might make to the company. The business development person said he would try to re-structure the contract to avoid this problem, but Relator never learned the outcome of the negotiations. As set forth below, 21ˢᵗ Century fired Relator before he could learn the outcome.

### THE OVERPAID ICC STAFF PHYSICIANS

42.     Relator soon discovered the company's problems were not limited to one new physician hire. As part of his job, Relator was responsible for identifying areas where the company was losing money and making recommendations for improvement.     To this end, Relator asked for a spreadsheet to be prepared identifying all of 21ˢᵗ Century's ICC Staff Physicians, along with the net operating profits or losses for each ICC Staff Physician.

43.     21ˢᵗ Century's staff prepared a spreadsheet that showed the following data, collected from January 1, 2015 to September 30, 2015, for every ICC Staff Physician:

| total revenue | the amount collected by 21ˢᵗ Century in revenue from services personally performed by the physician |
| --- | --- |
| physician compensation | the amount paid as compensation to the physician, excluding bonuses |
| ancillary bonus | any bonus amount paid to the physician |
| direct expenses including physician | the amount paid for direct physician expenses, such as physician staff |
| indirect expenses | the physician's share of general overhead |
| operating income | the total revenue collected from the physician's personal billings, less the total expenses associated with the physician. |

44.   Upon review of the spreadsheet, Relator discovered that 21st Century had more than thirty (30) ICC Staff Physicians around the country who were being paid more in compensation and associated expenses than the value of their own collections from personally performed services.   In other words, 21st Century was "losing money" on these ICC Staff Physicians:

| Physician | Specialty | Location | Effective Date | Loss,   1/15   – 9/15 |
|-----------|-----------|----------|----------------|------------------------|
| Saul, Howard | GYN Oncology | New Jersey | 7/15/13 | ($253,147) |
| D'Emilia | Surgical Oncology | | | ($387,071) |
| Sahgal, Nidhi | Breast Surgery | Yonkers, NY | 9/30/13 | ($273,117) |
| Powell, Stuart | Urology | North Carolina | 5/4/11 | ($88,008) |
| Williams, Nathan<br><br>Phelps, Shawna | GYN oncologist | North Carolina | 6/18/12<br><br>7/15/13 | ($860,749)* |
| Paschal, Barton | Medical Oncology | North Carolina | 10/1/09 | ($73,987) |
| Skibo, Scott North Carolina | Pulmonology | North Carolina | 1/6/14 | ($354,847) |
| Long, Robert | Urology | Ft.   Walton Bch., FL | 1/27/09 | ($283,753) |
| Avellone | Urology | | | ($212,428) |
| Tomaselli, Mary | Breast Surgery | East Coast, FL | 8/10/07 | ($499,192) |
| Berne, Evelyn | Breast Surgery | East Coast, FL | 8/5/13 | ($236,908) |
| Domenech, Gabriel | Medical Oncology | East Coast, FL | 10/27/14 | ($432,710) |
| Forszpaniak, Jan | Breast Surgery | Naples, FL | 8/1/06 | ($464,321) |
| Goldberger, | General Surgery | Ft. Myers, FL | 11/1/06 | ($192,495) |

| Physician | Specialty | Location | Effective Date | Loss, 1/15 – 9/15 |
|---|---|---|---|---|
| Jacob | | | | |
| Aihara, Rie<br><br>Rock, David | Breast Surgery | Ft. Myers, FL | 4/19/10<br><br>10/3/11 | ($206,959)* |
| Abu Shahin, Fadi<br><br>Barden, Eliot<br><br>Grendys, Edward<br><br>Orr, James<br><br>Sandadi, Samith | GYN Oncology | Ft. Myers, FL | 9/1/09<br><br>10/1/08<br><br>11/21/09<br><br>10/1/03<br><br>8/1/14 | ($1,317,690)* |
| Mourelo, Ramon | Surgical Oncology | Arizona | 6/10/14 | ($137,980) |
| Bans, Larry<br><br>Lipson, Robert | Urology | Arizona | 12/28/12<br><br>4/1/13 | ($606,640)* |
| Allgood, LeeAnn | Breast Surgery | Arizona | 12/1/08 | ($291,940) |
| Angeles | Surgery | | | ($202,830) |
| Philbin, Vicky | Surgery | Redding, CA | 8/29/11 | ($227,141) |
| Verma, Ajay | Medical Oncology | Redding, CA | 12/28/12 | ($506,915) |
| Gandhi | Surgery | | | ($477,326) |
| Minnick | Breast Surgery | | | ($138,659) |
| | | | | |
| **TOTAL** | | | | **$8,727,413** |

"*" indicates losses of two or more physicians grouped together for 21st Century accounting

purposes.

45.     In total, 21st Century lost in excess of $8.7 million in payments and expenses to the above ICC Staff Physicians through the first three quarters of 2015.  On information and belief, this pattern has been taking place since at least January of 2010.  Indeed, many of the above contracts have effective dates before January 1, 2010.

46.     Also, on information and belief, 21st Century employed many of these ICC Staff Physicians through third-party, single-purpose entities such as 21st Century Healthcare Affiliates, Inc.  Relator does not have access to all the names of these third-party entities and reserves the right to add these entities as they become discovered.

## RELATOR REPORTS COMPENSATION PROBLEMS

47.     The above payments to ICC Staff Physicians made no economic sense to Relator.  Relator spoke to his subordinate, Amy Lyons, regarding these salaries.  He asked what 21st Century historically did when it discovered it was losing money on physicians.  She replied that, in the past, she had been asked to collect the total revenue numbers derived from *referrals* made by ICC Staff Physicians.  The company then made contract renewal and compensation decisions based on the total revenue derived from personally performed services *and* from referrals.

48.     Based on his years of experience in dealing with physician compensation in the healthcare industry, Relator had great concerns that these compensation agreements with ICC Staff Physicians might be illegal.

49.     In or around the third week of November 2015, right before the Thanksgiving holiday, Relator met with CFO Stewart regarding the ICC Staff Physician salaries.  Relator prepared a spreadsheet showing the numbers set forth in paragraph 44 above, and he highlighted the most egregious examples of ICC Staff Physicians for whom 21st Century was losing money.

50.     Relator told the CFO that 21st Century was losing money on the highlighted physicians and that he had great concerns the contracts might not be legal.  The CFO thanked Relator for bringing these matters to his attention and told him she would look into it after the holiday break.

## 21ST CENTURY FIRES RELATOR

51.     Relator never returned to 21st Century.  Before the holiday break ended, he received a call from Tatum, telling him that he had been terminated.   According to Tatum, 21st Century complained that Relator was arrogant and had accused the company of illegal behavior. (The latter charge was true, although Relator's goal was to help the company correct its problems.)

52.     Tatum also claimed that 21st Century had discovered that Relator had made an accounting error while previously employed by St. Francis Hospital in Georgia, which resulted in his termination and negative press for the hospital.  This was a clear pretext for termination, as Relator had fully disclosed this issue to 21st Century prior to being hired.

53.     All of 21st Century's stated reasons for the discharge were pretextual. In reality, the company's true motivation was to discharge Relator because he had complained about illegal physician compensation agreements.

## THE STARK VIOLATIONS

54.     The ICC Staff Physicians in paragraph 44 referred patients, including Medicare and Medicaid patients, to 21st Century for Designated Health Services, including but not limited to, radiation oncology services, imaging, and laboratory services.

55.     21st Century tracks the referrals of Designated Health Services made by ICC Staff Physicians.

56.    21st Century determined that, despite paying the ICC Staff Physicians in paragraph 44 more than the amount collected for personally performed services, the ICC Staff Physicians were still profitable to the company based on income generated from referrals of Designated Health Services by these physicians.

57.    Given that these physicians were paid total compensation that exceeded the collections received for their physician services, 21st Century cannot have reasonably concluded that the compensation arrangements for these physicians were fair market value for their services or were commercially reasonable.

58.    Given that each ICC Staff Physician in paragraph 44 received compensation that took into account the volume or value of referrals or other business generated by the referring physician, or received compensation that was not fair market value or commercially reasonable, 21st Century could not have reasonably concluded the arrangements complied with the Stark Law.

59.    Based on the contractual and financial relationships between 21st Century and the ICC Staff Physicians in paragraph 44, none of the statutory or regulatory exceptions to the Stark Law apply.

## FALSE AND FRAUDULENT STATEMENTS

60.    21st Century presented, or caused to be presented to a fiscal intermediary, claims for payment to the Medicare program for Designated Health Services provided on referrals from physicians with whom 21st Century had entered into prohibited financial relationships.   21st Century also presented or caused to be presented to the State of Florida claims for payment to the Medicaid program for Designated Health Services based on referrals from physicians with whom the company had entered into prohibited financial relationships as set forth in paragraph 44

above.

61.     21st Century thereby obtained payments from the United States in violation of the Stark Law.

62.     Under the False Claims Act, 31 U.S.C. 3729(a)(1)(A), the claims set forth in paragraph 61 above were false and/or fraudulent because 21st Century was prohibited by the Stark Law from obtaining payment from the United States upon claims for Designated Health Services provided on referrals from physicians with whom the company had entered into prohibited financial relationships.

63.     Defendants also violated the False Claims Act, 31 U.S.C. 3729(a)(1)(B), by making false statements, or causing false statements to be made to a fiscal intermediary, to get claims paid by Medicare for Designated Health Services provided on referrals from physicians with whom the company had entered into prohibited financial relationships.

64.     21st Century knowingly made, used, and caused to be made or used false records and statements to conceal, avoid or decrease its obligations to pay or transmit money to the United States (*i.e.*, to avoid refunding payments made in violation of the Stark Law) by certifying that services were provided in compliance with the federal law, all in violation of the False Claims Act, 31 U.S.C. 3729(a)(7).

65.     21st Century presented or caused to be presented, all of said false claims with actual knowledge of the falsity, or in deliberate ignorance or reckless disregard that such claims were false and fraudulent.

### Attorneys' Fees and Conditions Precedent

66.     On information and belief, the fraudulent schemes outlined above have caused the Government to pay false claims in the millions of dollars.

67.     Relator has hired the undersigned counsel and is obligated to pay a reasonable attorneys' fee.

68.     All conditions precedent have been performed or waived.

69.     The allegations and transactions described in this Complaint have not been publicly disclosed within the meaning of the False Claims Act.  To the extent a public disclosure has taken place, Relator is the original source of the information in this Complaint.  That is to say, he has knowledge that is independent of and materially adds to any publicly disclosed information.

### COUNT I
### 31 U.S.C. § 3729(a)(1)(A)

70.     Relator realleges the allegations made in Paragraphs 1 through 69.

71.     This is a claim for treble damages and forfeitures under the False Claims Act, 31 U.S.C. §§ 3729-32, as amended.

72.     Through the acts described above, 21st Century and its agents and employees knowingly presented and caused to be presented to the Government false or fraudulent claims for designated health services resulting from referrals by the ICC Staff Physicians.

73.     The Government, unaware of the falsity of the claims made or caused to be made by 21st Century, approved, paid, and participated in payments made by the Government's fiscal intermediaries for claims that otherwise would not have been allowed.

74.     By reason of these payments and approvals, the Government has been damaged and continues to be damaged, in an amount yet to be determined.

75.     WHEREFORE, Relator requests that judgment be entered against 21st Century for three times the amount of damages sustained by the Government; and civil penalties of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729; and all costs of

18

this action, including attorneys' fees, expenses, and costs pursuant to 31 U.S.C. § 3730(d); and such other relief as the Court deems just and proper.

**COUNT II**
**31 U.S.C. § 3729(a)(1)(B)**

76.     Relator realleges the allegations made in Paragraphs 1 through 69.

77.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729 *et seq.*

78.     Through the acts described above, 21st Century knowingly made, used and caused to be used false records and statements material to get false or fraudulent claims paid or approved by the Government.

79.     The Government was unaware of the falsity of the records, statements, and claims submitted by 21st Century and their agents, principals, employees, and contractors for claims that would not have been paid had the truth been known.

80.     By reason of the 21st Century false records, statements, and claims, the Government has been damaged, in an amount yet to be determined.

81.     WHEREFORE, Relator requests that judgment be entered against 21st Century for three times the amount of damages sustained by the Government; and civil penalties of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729; and all costs of this action, including attorneys' fees, expenses, and costs pursuant to 31 U.S.C. § 3730(d); and such other relief as the Court deems just and proper.

**Count III**
**31 U.S.C. § 3729(a)(1)(G)**

82.     The Relator realleges the allegations made in Paragraphs 1 through 69.

83.     This is a claim for treble damages and penalties under the False Claims Act, 31

19

U.S.C. § 3729 *et seq.*

84.     Through the acts described above, 21st Century made and used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money to the United States, or knowingly concealed, avoided or decreased an obligation to pay or transmit money to the United States.

85.     Said false records or statements were made with actual knowledge of the falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

86.     By reason of the 21st Century false records, statements, and claims, the Government has been damaged, in an amount yet to be determined.

87.     WHEREFORE, Relator requests that judgment be entered against 21st Century for three times the amount of damages sustained by the Government; and civil penalties of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729; and all costs of this action, including attorneys' fees, expenses, and costs pursuant to 31 U.S.C. § 3730(d); and such other relief as the Court deems just and proper.

### Count IV
### 31 U.S.C. §§ 3730(h)

88.     Relator realleges the allegations made in Paragraphs 1 through 69.

89.     This is a claim for retaliation pursuant to the False Claims Act, 31 U.S.C. § 3730(h) *et seq.*

90.     In the latter part of 2015, Relator had numerous meetings with his supervisors at 21st Century during which Relator expressed his concerns that the company was in violation of federal law governing physician compensation. Relator reported these violations to his superiors in an effort to correct ongoing misconduct.

91.     21st Century did not correct the misconduct.  Instead, the company discharged and discriminated against Relator in the terms and conditions of his employment in retaliation for his efforts to stop violations of the Stark Law and the False Claims Act.

92.     By reason of the Defendant's conduct, Relator has been damaged.

93.     WHEREFORE, Relator requests that judgment be entered against 21st Century, ordering reinstatement, two times back pay, interest, attorneys' fees, and such other relief as the Court deems just and proper.

### Jury Demand

Pursuant to Federal Rule of Civil Procedure 38, the Relator hereby demands a trial by jury.

Dated: February 2, 2016

Respectfully submitted,

**McCabe Rabin, P.A.**
1601 Forum Place, Suite 505
West Palm Beach, FL 33401
561-659-7878
Ryon M. McCabe
Florida Bar No. 009075
rmccabe@mccaberabin.com
Adam T. Rabin
Florida Bar No. 985635
arabin@mccaberabin.com